IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

WILLIE EARL PONDEXTER, JR., §
   Petitioner

         §

VS.             No. 6:99cv68

         §

NATHANIEL QUARTERMAN, Director
Texas Department of Criminal Justice, §
Correctional Institutions Division,
   Respondent  §

## MEMORANDUM OPINION

Willie Earl Pondexter, Jr. ("Petitioner"), an inmate confined to the Texas Department of

Criminal Justice, Correctional Institutions Division, filed a petition for writ of *habeas corpus*

pursuant to 28 U.S.C. § 2254.  Petitioner challenges his capital murder conviction and death sentence

imposed on July 19 and 20, 1994, in the 102nd Judicial District Court of Bowie County, in cause

number D-102-CR-94-262, styled *The State of Texas v. Willie Earl Pondexter, Jr.* [1]

This case is governed by the Antiterrorism and Effective Death Penalty Act ("AEDPA")

because Petitioner's petition for federal *habeas corpus* relief was filed on November 30, 1999, after

the AEDPA's effective date of April 24, 1996.  The AEDPA provides, in pertinent part

(d) An application for writ of *habeas corpus* on behalf of a person in custody pursuant to the
judgment of a State court shall not be granted with respect to any claim that was adjudicated
on the merits in State court proceedings unless the adjudication of the claim
(1) resulted in a decision that was contrary to, or involved an unreasonable
application of, clearly established Federal law, as determined by the Supreme Court
of the United States; or
(2) resulted in a decision that was based on an unreasonable determination of the

---

[1] Prior to trial, the court granted Petitioner's request for change of venue from Red River County to Bowie
County.  The 102nd Judicial District Court encompasses both Red River and Bowie Counties.

facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

On September 23, 2002, this Court granted relief on Petitioner's first claim alleging that trial counsel rendered ineffective assistance of counsel for failing to consult with and offer the testimony of a pathologist during the guilt-innocence phase of trial.  On appeal, the Fifth Circuit Court of Appeals vacated this Court's judgment, holding that under the AEDPA's deferential standard, the State court's conclusion that Petitioner did not demonstrate that he was prejudiced by his counsels' conduct was not contrary to, or an unreasonable application of, clearly established federal law. *Pondexter v. Dretke*, 346 F.3d 142 (5th Cir. 2003).  The Court of Appeals remanded the cause for further proceedings.  *Id*. at 153.  The facts and procedural history of this case can be found in the Fifth Circuit opinion.  *Id.* at 143-44.  The Court will now address Petitioner's remaining claims.[2]

In his third and fourth claims for relief, Petitioner argues that (1) the prosecution withheld exculpatory evidence that Petitioner did not intend to cause the death of the alleged victim, and (2) this new evidence proves that he is actually innocent of capital murder.  In support of his claim, Petitioner relies upon an affidavit by Michael Kendricks, a former cell mate of Petitioner, made in

---

[2]  In the original opinion, this Court determined that the State court's denial of Petitioner's actual innocence claim based on "new expert pathological evidence" was reasonable.  Petitioner also complains about the destruction of an audiotape made by the medical examiner and prosecution's expert witness, Dr. Guileyardo, during the autopsy of the victim which allegedly formed the basis of the written report setting forth Dr. Guileydardo's conclusions.  Petitioner speculates that the audiotape "could have shown that the second shot did not cause the [victim's] death. . . . [W]hat it would have shown and how it would have supported [Petitioner's] case cannot now be know, along with whether any of its contents varied with the written autopsy report."  In its findings of fact, the State *habeas* court found that no misconduct in regard to the missing audiotape took place.  The court noted that the "actual record which must be maintained is the autopsy report which was made available to [Petitioner].  The tape-recorded notes are not maintained by the Dallas Medical Examiner's office in the ordinary course of business."  Defense counsel cross-examined Dr. Guileyardo regarding his autopsy findings at length at both the trial and the State *habeas* evidentiary hearing.  Petitioner was provided a copy of the autopsy report, and employed the services of a pathologist to review and evaluate the report.  There is nothing to suggest that the audiotape would have contained findings contrary to those made in Dr. Guileydardo's written report, and Petitioner's mere speculation that such is the case is insufficient to support his claim.

October of 1997 which states "[Petitioner] also told me that he knew that the victim . . . was already dead before he shot her. . . .  I told . . . this to the State's Investigator that talked with me about this before the trial."  Petitioner contends that this information was not revealed to him prior to trial. Petitioner argues that he could not have intended to cause the victim's death, as required for a capital murder conviction, because he knew that the victim was already dead when he shot her.  The Texas Court of Criminal Appeals rejected these claims in Petitioner's application for State post-conviction relief.

To prevail on a claim that the prosecution withheld evidence, a petitioner must prove that (1) the prosecution suppressed evidence; (2) the evidence was favorable to the defense either because it was exculpatory, or because it was impeaching; and (3) that the evidence was material either to guilt or punishment.  *See Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Strickler v. Greene,* 527 U.S. 263, 281-82 (1999).  The Texas Court of Criminal Appeals found that Petitioner's statement was not exculpatory because there was no showing that Petitioner was qualified to make the assessment that the victim was already dead when he shot her.  Therefore, the State court found that Petitioner's statement was irrelevant.  Additionally, the State court found that there was "no evidence that the State had knowledge of Kendrick's allegation that [Petitioner] supposedly knew the victim was dead when he shot her" and  "no reasonable likelihood that this evidence, had it come before the jury, would have altered the outcome of the trial."  The inquiry for this Court is whether the State court's decision was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court.  *See* 28 U.S.C. §2254(d)(1).

In this Court, as in the State court, Petitioner has failed to produce evidence demonstrating that the prosecution suppressed exculpatory evidence.  While Kendricks does state in his affidavit

3

that he told investigators about Petitioner's statement, Petitioner has not produced a document or testimony that shows that the prosecution was ever privy to the exculpatory statement.[3]   More important, if Petitioner did make this statement to Kendricks, Petitioner was in the best position to know about the statement and to inform his trial counsel so that counsel could bring it out at trial. "[W]hen information is fully available to a defendant at the time of trial and his only reason for not obtaining and presenting the evidence to the Court is his lack of reasonable diligence, the defendant has no *Brady* claim." *United States v. Brown*, 628 F.2d 471, 473 (5th Cir. 1980).

Petitioner's actual innocence claim also fails.  Claims of actual innocence are not grounds for federal *habeas corpus* relief.  *See Herrera*, 506 U.S. at 400.  Accordingly, this Court finds that the State court's decision to deny Petitioner's claims was not contrary to, or an unreasonable application of, clearly established federal law as determined by *Brady*.  The Court will grant the Director's motion for summary judgment on Petitioner's third and fourth claims.

In his fifth claim, Petitioner argues that his trial counsel were ineffective in failing to interview Kendricks, and as a result, the exculpatory evidence discussed above was not brought before the jury.  Petitioner reurges his belief that the exculpatory evidence negated the specific intent element of the capital murder charge.  In order to establish a claim of ineffective assistance of counsel, a petitioner must demonstrate both that counsel's performance was deficient and that, had counsel performed competently, there would be a reasonable probability that the result in the case would have been different.  *Strickland v. Washington*, 466 U.S. 668, 687, 694 (1984).  "Deficient

---

[3]  Petitioner's trial attorneys testified in their affidavits that the prosecution "never revealed . . . that Michael Kendricks had told the State's Investigator before trial that [Petitioner] also said that he knew that the victim . . . was already dead before he shot her."  These affidavits do not allege that the State obtained this information from Kendricks, nor do they prove that the State had the information but did not disclose it to Petitioner.

4

performance" is demonstrated by a showing that, in light of all the circumstances, counsel's performance fell below an objective standard of reasonableness. *Id*. at 687-88.  In determining whether counsel's performance was deficient, the court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id*. at 689.  To prove prejudice, the second prong under *Strickland*, a petitioner must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.  A "reasonable probability" is a probability sufficient to undermine confidence in the outcome of the proceeding.  *Id*.

The State court found that the information in the affidavit was not exculpatory, and therefore, "counsel was not deficient for failing to have the information brought to the attention of the jury." Furthermore, as noted above, if Petitioner did make the statement that he knew the victim was dead when he shot her, he would be in the best position to make that information known to defense counsel.  "Counsel's actions are usually based . . .  on information supplied by the defendant." *Strickland*, 466 U.S. at 691.  Had Petitioner informed counsel of the statement, counsel could then determine whether to question Kendricks about Petitioner's statement.  The Court finds that the State court's decision was not contrary to, or an unreasonable application of, clearly established federal law as determined by *Strickland*.  The Court will grant the Director's motion for summary judgment as to Petitioner's fifth claim.

In claims six through eight, Petitioner argues that (1) the prosecution knowingly used perjured testimony of punishment witness Linda Thomas to support a finding in favor of the death penalty; (2) the prosecution suppressed exculpatory evidence that Thomas lied due to pressure from law enforcement authorities; and (3) new evidence exists which proves that Thomas' testimony was

5

false.

At the punishment phase, Thomas testified that Petitioner brutally attacked her by stabbing her in the lungs and stomach with scissors. The crux of Petitioner's claim is affidavit and evidentiary hearing testimony from his father, Willie Pondexter, Sr. ("Mr. Pondexter"), that Thomas told Mr. Pondexter that she lied about Petitioner attacking her because the police "made a deal with [her] that they would cut [her] some slack on sentencing" in connection with her own criminal charges in an unrelated case. In response to Petitioner's claims in his State petition, the Texas Court of Criminal Appeals determined that Thomas' post-trial affidavit, which affirmed her in-court testimony, was truthful. The State court also found Mr. Pondexter's affidavit and in-court testimony at the State post-conviction evidentiary hearing, as well as Daina Winston's affidavit stating that she did not see Petitioner attacking Thomas, was "completely untruthful" and "not credible." Under 28 U.S.C. § 2254(e)(1), "a determination of a factual issue made by a State court shall be presumed to be correct" and Petitioner has the burden of rebutting the presumption by clear and convincing evidence.

To be entitled to relief on a claim that the prosecution introduced perjured testimony, Petitioner must prove that (1) Thomas testified falsely, (2) the prosecution knew the testimony was false, and (3) the false testimony was material. *See Giglio v. United States*, 405 U.S. 150, 153-54 (1972); *Knox v. Johnson*, 224 F.3d 470, 477 (5th Cir. 2000), *cert. denied*, 532 U.S. 975 (2001). The Texas Court of Criminal Appeals determined that Thomas' testimony was truthful and that Mr. Pondexter's testimony that Thomas told him that she had lied at Petitioner's trial was "completely untruthful." Petitioner has failed to offer any evidence, much less clear and convincing evidence, to rebut the presumption accorded the State court's fact findings. *See* 28 U.S.C. 2254(e)(1).

6

Because Petitioner has not proved the first element of his *Giglio* claim, that Thomas testified falsely, his claim must fail.

Petitioner also argues that the prosecution suppressed exculpatory evidence that Thomas testified falsely due to pressure from law enforcement authorities relating to charges they could file against her.  The Court reiterates that, under *Brady*, the prosecution must disclose evidence to a criminal defendant if that evidence is favorable to the defendant and material to the defendant's guilt or punishment.  The Texas Court of Criminal Appeals found that "Thomas did not give her testimony in exchange for an agreement that Oklahoma officials would be lenient upon her."  Like the State court's finding that Thomas testified truthfully about Petitioner's brutal assault against her, the finding that there was no agreement between police and Thomas is unchallenged.  *See* 28 U.S.C. § 2254(e)(1).  The only evidence presented by Petitioner to support his claim is Mr. Pondexter testimony, which the State court found "completely untruthful."  This testimony, even if it were true, does not show that any type of agreement existed.  Rather, Petitioner's claim rests upon a substantial degree of speculation.  A Petitioner's speculation about the suppression of exculpatory evidence is an insufficient basis to support a *Brady* claim.  *Hughes v. Johnson*, 191 F.3d 607, 630 (5th Cir. 1999), *cert. denied*, 528 U.S. 1145 (2000).

Next, Petitioner claims that new evidence proves that Petitioner did not assault Thomas.  The "new evidence" Petitioner is referring to is Mr. Pondexter's affidavit and evidentiary hearing testimony, as well as Daina Winston's affidavit.  Like the preceding two claims, this claim must fail.  The State court found the evidence Petitioner relies upon here to be "completely untruthful" and Petitioner offers no other evidence to rebut the State court's fact finding.  28 U.S.C. § 2254(e)(1).  Accordingly, the Court will grant the Director's motion for summary judgment on Petitioner's sixth,

seventh, and eighth claims.

In his ninth claim for relief, Petitioner argues that his counsel were ineffective in failing to interview Thomas prior to trial.  Petitioner asserts that if counsel had interviewed Thomas, they would have discovered that she was pressured by the authorities to testify falsely against Petitioner.  This evidence could then have been used by counsel to impeach Thomas' testimony about the attack.  Petitioner also complains that counsel testified that they were unaware that violence was involved in the incident with Thomas, despite the prosecution's notice of extraneous offence evidence which listed "assault and battery with a deadly weapon, sharp pointed object, committed against Linda Thomas . . . ."  In light of this notice, Petitioner claims that counsels' strategy in not interviewing Thomas was unreasonable.  Petitioner argues that Thomas' testimony was critical to the issue of whether he posed a future danger to society.

The Texas Court of Criminal Appeals found that because Thomas' testimony about Petitioner attacking her was truthful, Petitioner did not show that his counsels' failure to interview Thomas was deficient conduct or prejudiced his case, as required under *Strickland*.  The State court's conclusion that Thomas testified truthfully is a finding of fact.  As discussed above, Petitioner has failed to rebut this finding by clear and convincing evidence.   In order to prevail on the prejudice prong of a *Strickland* claim, Petitioner must demonstrate that had counsel performed competently, there would be a reasonable probability that the result in the case would have been different.  *Strickland*, 466 U.S. at 687, 694.  Contrary to Petitioner's assertion, interviewing Thomas would not have revealed that she was pressured by the police to testify falsely, and thereby provide evidence to impeach Thomas.  Because Thomas testified truthfully, there is not a reasonable probability that, but for counsels' decision not to interview Thomas, the result of his trial would have been different.  The State court's

8

resolution of this claim under *Strickland* was reasonable.  *See* 28 U.S.C. § 2254(d)(1).

As part of his ninth claim, Petitioner complains that the State court adopted the prosecution's proposed findings of fact and conclusions of law verbatim and without an additional hearing.  This is an attack on the adequacy of the State court proceedings which is not a relevant subject for review by this Court under the AEDPA.  *See Nichols v. Scott*, 69 F.3d 1255, 1275 (5th Cir. 1995), *cert. denied*, 518 U.S. 1022 (1996) (explaining that "[a]n attack on a state *habeas* proceeding does not entitle the petitioner to *habeas* relief in respect to his conviction, as it is an attack on a proceeding collateral to the detention and not the detention itself").  The Court will grant the Director's motion for summary judgment on Petitioner's ninth claim.

In his tenth claim for relief, Petitioner argues that his rights were violated when the trial court granted the prosecution's challenge for cause against veniremember Rosemary Kelly based upon her personal views in opposition of the death penalty.  Petitioner contends that Kelly demonstrated that she was willing to assess the death penalty despite the fact that she was personally against it.  The Texas Court of Criminal Appeals rejected this claim in Petitioner's application for State post-conviction relief concluding that "Kelly's ability to truthfully answer the special issues was substantially impaired as a result of her conscientious scruples against the death penalty."  A trial judge's finding of bias during *voir dire* is a determination of fact, subject to a presumption of correctness on collateral review.  *See Wainwright v. Witt*, 469 U.S. 412, 429 (1985).

The proper standard for determining when a prospective juror may be excluded for cause because of his views on capital punishment is to decide whether "the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'"  *Id*. at 424 (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)).  The trial court has

discretion to excuse a juror for cause when the court "is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law." *See id.* at 426. Although the trial court's dismissal of a prospective juror on this basis is reviewed for abuse of discretion, the trial court is given "considerable deference . . . because such decisions are based on face-to-face credibility assessments." *United States v. Webster*, 162 F.3d 308, 340 (5th Cir. 1998), *cert. denied*, 528 U.S. 829 (1999).  In support of this claim, Petitioner relies upon the following exchange between defense counsel and Kelly:

Defense:    [W]ould you be able to answer that question [the mitigation special issue] "no," knowing that the judge was going to impose the death sentence?
Kelly:      Could I answer it knowing that if I say "no" there is going to be a death penalty?
Defense:    That's right.
Kelly:      Yes.
Defense:    You could answer it "no?"
Kelly:      Right.

Petitioner maintains that this exchange demonstrates that Kelly could assess the death penalty despite the fact that she was personally opposed to such punishment.  The Texas Court of Criminal Appeals found that Kelly "had conscientious scruples against the imposition of the death penalty.  Her scruples . . . stemmed from her deep-seated, [sic] moral, religious, or personal beliefs."  While acknowledging that on two occasions Kelly stated that she could honestly answer the special issues, the State court pointed out that Kelly also stated that she could "never under any circumstances return a verdict which assessed the death penalty."  During questioning by the prosecution, Kelly indicated that she could not follow the law and answer the special issues in such a way as would result in the death penalty.  When the trial court attempted to clarify Kelly's position on the death penalty, Kelly told the court that she could not impose the death penalty and would always answer the questions so that the defendant would receive a life sentence.  She stated that she could not

10

"follow the death penalty" and that she did not believe in it.

Petitioner has failed to overcome the presumption of correctness applied to the trial court's finding that Kelly was biased against the death penalty.  Furthermore, any ambiguity that might arise from inconsistent answers by the veniremember is resolved in favor of the trial court's decision.  *See id*.  The Court concludes that there is ample support for the trial court's finding that Kelly's views would have substantially impaired the performance of her duties as a juror.  Because the State court's decision on this claim was reasonable under 28 U.S.C. § 2254(d)(1), the Director's motion for summary judgment on Petitioner's tenth claim will be granted.

In his eleventh claim for relief, Petitioner contends that he was denied effective assistance of counsel when his trial attorney failed to interview fact witnesses and failed to present expert psychological testimony that would have shown that Petitioner was not a future danger to society. Petitioner argues that trial counsel should have interviewed Richard Miller and Daina Winston, who allegedly would have testified that Petitioner was not dangerous in a structured setting, as well as put on expert testimony demonstrating that Petitioner was not a future danger.  The Texas Court of Criminal Appeals rejected Petitioner's claim on State *habeas corpus* review.  The issue before this Court is whether the State court's decision was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by *Strickland*.  *See* 28 U.S.C. § 2254(d)(1).

William Glenn, a private investigator hired by Petitioner's State *habeas* attorney, interviewed Miller and Winston and prepared an affidavit detailing his conversations with the individuals. Miller, who was assistant principal of Idabel High School when Petitioner was a student there, told Glenn that Petitioner "was quiet and for the most part, trouble free in the structured school setting. . . . He did not see him as dangerous."  Winston, described as "very active in civic matters" in

11

Idabel, told Glenn that Petitioner "was not dangerous, . . . would only fight when provoked, . . . [and]

is in the trouble he is in because he is a follower."  The Texas Court of Criminal Appeals noted that

Petitioner failed to present affidavits directly from Miller or Winston and dismissed Glenn's affidavit

as hearsay.  It is well recognized that "[c]omplaints of uncalled witnesses are not favored, because

the presentation of testimony evidence is a matter of trial strategy and because allegations of what

a witness would have testified are largely speculative."  *Buckelew v. United States*, 575 F.2d 515,

521 (5th Cir. 1978).  Nonetheless, assuming *arguendo* that trial counsels' failure to interview Miller

and Winston was deficient, the State court found that based on the "in-court testimony of the state's

guilt-innocence witnesses and the state's punishment phase witnesses, . . . [Petitioner] is a future

danger" and held that Petitioner "failed to show that, but for the acts, or omissions, of his trial

counsel there was a reasonable probability that he would have received a sentence of life rather than

death."  This Court agrees that the testimony of Miller and Winston, as relayed in Glenn's affidavit,

would carry little weight in light of other evidence of Petitioner's future dangerousness presented

by the prosecution.  Therefore, the Court finds that the State court's decision is reasonable under

*Strickland*.

Petitioner also argues that had counsel obtained competent psychological assistance, they

would have been able to present evidence that Petitioner did not pose a future danger.  In support of

his position, Petitioner relies upon the affidavit of Dr. Dick Eiles which states that Petitioner was

unlikely to commit criminal acts of violence in the future, especially in a structured environment

such as prison.  Additionally, Petitioner points out his trial counsel's admission that he should have

probably checked into whether Petitioner had any serious mental problems.

The State *habeas* court found that Petitioner made no showing that he has any mental

disabilities; this fact finding is presumed correct.  *See* 28 U.S.C. § 2254(e)(1).  The Fifth Circuit has stated that when counsel had no reason to believe that a petitioner suffered from a mental defect, failure of counsel to investigate psychological origins of the petitioner's mental condition was not ineffective assistance of counsel.  *See Barnard v. Collins*, 958 F.2d 634, 642 (5th Cir. 1992), *cert. denied*, 506 U.S. 1057 (1993).  Moreover, Petitioner was examined by a psychologist prior to trial, but the psychologist told trial counsel that his opinions would not help Petitioner's case.  In light of this fact, the Court finds counsels' decision not to present psychological testimony at the punishment phase was reasonable trial strategy born of informed judgment.

The State court's denial of Petitioner's ineffective assistance of counsel claim was not contrary to, or an unreasonable application of, clearly established federal law under *Strickland*.  *See* 28 U.S.C. § 2254(d)(1).  The Court will grant the Director's motion for summary judgment on Petitioner's eleventh claim.

In his twelfth claim for relief, Petitioner argues that Dr. Eiles' affidavit, as well as Glenn's affidavit containing the statements made by Miller and Winston, constitute new evidence that he is not a future danger to society.  Petitioner appears to be arguing that the new evidence makes him "innocent of the death penalty."  *See Sawyer v. Whitley*, 505 U.S. 333 (1992).  To prevail on such a claim, a petitioner must demonstrate "by clear and convincing evidence that but for constitutional error at his sentencing hearing, no reasonable juror would have found him eligible for the death penalty."  *Id*. at 350.  As discussed in the preceding claim, there is not a reasonable probability that the result of the trial would have been different had Miller, Winston, or an expert psychologist testified as to future dangerousness.  The reasonable probability standard is lower than that needed to establish by "clear and convincing evidence" that Petitioner was innocent of the death penalty.

13

As for Dr. Eiles's testimony, it fails to prove that Petitioner does not pose a future danger.  The Director's motion for summary judgment on Petitioner's twelfth claim will be granted.

In his thirteenth claim, Petitioner argues that he was denied his constitutional right to be present at all trial proceedings.  Specifically, Petitioner complains that he was not present when the trial court took up an incident involving one of the jurors who received a phone call while sequestered.  Upon review of this claim in Petitioner's State application for post-conviction relief, the State court found that, having failed to make a contemporaneous objection to his absence, Petitioner's claim relating to the juror was waived.  The record clearly demonstrates that Petitioner waived any complaint about his absence during the proceedings involving juror Smith.  Where a petitioner fails to follow a state procedural rule, and as a result the state courts refuse to review his constitutional claim, federal *habeas corpus* review is barred unless the petitioner shows either cause for the default and actual prejudice resulting therefrom, or that failure to consider the claim would result in a "fundamental miscarriage of justice."  *See Murry v. Carrier*, 477 U.S. 478, 485 (1986) (*citing Wainwright v. Sykes*, 433 U.S. 72, 87 (1977)).  "Cause" factors may include interference by officials that makes compliance with the procedural rule impracticable, a showing that the factual or legal basis for the claim was not reasonably available to counsel, and ineffective assistance of counsel.  *Id*. at 488.

In his fourteenth claim, Petitioner argues that his trial counsel was ineffective for failing to secure his presence at the proceedings in issue.  If established, this claim is sufficient to satisfy cause for the default.  To demonstrate that his counsel was constitutionally ineffective, Petitioner must show both that his trial counsel's performance was deficient and that this deficient performance prejudiced his defense.  *Strickland*, 466 U.S. at 687, 694.

14

After the guilt/innocence phase, but before the punishment phase, juror Billy Smith informed the court that he had received a telephone call from a member of the initial jury panel.  Defense counsel was permitted to question Smith about the substance of the phone conversation.  Smith explained that Mr. Gaulden called him to continue a discussion that the two had begun during jury selection about the possibility that their mothers knew each other, and Smith gave Gaulden some information about Smith's family background.  Smith and Gaulden also discussed the fact that they were not suppose to speak to each other during the trial, and Gaulden apologized for contacting Smith.  Smith stated that Gaulden did not ask him anything about the trial and that they did not discuss anything that would enter into the juror's mind during deliberations.  Smith expressed his concern that he did not want to receive any other phone calls during the trial.  Defense counsel then informed Petitioner about what had transpired between Smith and Gaulden, and the substance of their conversation.  Defense counsel asked Petitioner if he had any objection to Smith remaining on the jury, and Petitioner responded, "No."

After finding that the claim was waived, the State court concluded that, in any event, Petitioner was not prejudiced by his absence because there was no "outside influence . . . brought to bear upon the substance of the trial proceedings. . . . .  The telephone call was wholly about matters which had nothing to do with [Petitioner's] trial."  The issue for this Court is whether the State court's decision was contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court.  *See* 28 U.S.C. § 2254(d)(1).

This Court finds that the State court's decision on this issue was reasonable.  Petitioner is not entitled to relief because he cannot show that he was prejudiced by his absence during the proceedings.  The substance of the telephone conversation did not touch upon Petitioner or the trial.

15

Smith brought the matter to the court's attention to emphasize that he was following the court's instructions and did not wish to be contacted again during the trial.   Contrary to Petitioner's contention, there was no indication that Smith was influenced to vote in favor of the death penalty because he was concerned that he might be contacted by Petitioner after the trial.   The State *habeas* court, which was also the trial court in this case, indicated in its findings that if Petitioner had objected to his absence that the court simply would have asked Smith to testify about the incident in Petitioner's presence.   Petitioner has not indicated how his presence would have effected the outcome of the proceedings.   *See Strickland*, 466 U.S. at 687.

Petitioner also objects to his absence during a discussion of the scope of cross-examination of the prosecution's punishment witness Linda Thomas.   The trial court held that defense counsel was permitted to ask Thomas whether she had been convicted of a crime in Iowa, and what the crime was, but nothing else.   As the Director points out, this ruling was actually favorable to Petitioner in that introduction of Thomas' conviction, which could be used to impeach the witness' credibility, might not have been allowed under the Texas Rules of Evidence.   Tex. R. Evid. 609(b) (evidence of conviction under this rule not admissible if period of more than ten years has elapsed since date of conviction or release of witness from confinement).   Nonetheless, Petitioner has failed to demonstrate how his absence during the trial court's ruling on this matter of evidentiary law deprived him of the right to a fair trial under the constitution.

The trial court's decision that Petitioner was not prejudiced by his absence was not contrary to, or an unreasonable application of, federal law as determined by the Supreme Court in *Strickland*. *See* 28 U.S.C. 2254(d)(1).   The Court will grant the Director's motion for summary judgment on Petitioner's thirteenth and fourteenth claims.

16

In his fifteenth claim for relief, Petitioner argues that the prosecution made improper jury arguments throughout his trial which deprived him of due process and equal protection under the Constitution.  The Texas Court of Criminal Appeals found this claim procedurally barred on state *habeas* review because Petitioner failed to object to the allegedly improper arguments at trial.  As the Court discussed in the preceding two claims, where a petitioner fails to follow a state procedural rule, and the state courts refuse to review his constitutional claim, federal *habeas corpus* review is barred unless the petitioner shows either cause and prejudice, or a fundamental miscarriage of justice.  *See Murry*, 477 U.S. at 485.

In his sixteenth claim, Petitioner contends that he was denied effective assistance of counsel as a result of his attorneys' failure to object to the prosecutor's improper jury argument.  If proven, this is sufficient to satisfy the cause requirement.  In addition to finding the improper jury argument claim waived, the State court found that even if the claim had not been waived, the prosecutor's arguments were proper and any improper argument did not prejudice Petitioner due to the "overwhelming evidence of guilt and extensive punishment phase evidence."[4]  The inquiry for this Court is whether the State court's decision was contrary to, or an unreasonable application of, clearly established federal law.  *See* 28 U.S.C. § 2254(d)(1).

## 1.  Injecting personal opinion

Petitioner first complains about the prosecutor injecting his personal opinion about the case

---

[4]Where improper prosecutorial argument is asserted as a basis for *habeas* relief, "it is not enough that the prosecutors' remarks were undesirable or even universally condemned," rather '[t]he relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  The burden is on the *habeas* petitioner to show a reasonable probability "that but for these remarks, the result would have been different." *See Felde v. Blackburn*, 795 F.2d 400, 403 (5th Cir. 1986), *cert. denied*, 484 U.S. 873 (1987).  This analysis mirrors the prejudice prong set forth in *Strickland*.

throughout the trial.  Specifically, Petitioner argues that the following comments were improper:

> *I think* this case is probably going to be as close to guilty beyond all doubt as you are ever going to see.

> But the evidence I guess that seems pretty strong *to me* . . . .

> *I find* it a little bit absurd to consider the idea that she was already dead.

> As we talked before, *I think* you will be duty bound . . . .

> [A]nd *I will guarantee* you that there is not a person in this jury box that would give that [correctional officer] any lip.

> In the *State's opinion, and the State* knows that special issue No. 1 for future dangerousness has been proven clearly, . . . .

> We don't even have to worry about beyond a reasonable doubt.  *I think* beyond all doubt that he will [pose a continuing threat to society].

> His sister says "I would leave [Petitioner] with my kids any time."  Boy, *I'll bet* you none of you would leave him with your kids.

> Mitigating circumstances, like *I say, I think* that's absolutely ridiculous to think the evidence you heard from that stand is worth any weight at all.

Although a prosecutor "may not express his personal opinion as to the credibility of witnesses, or his own belief regarding a defendant's guilt," *United States v. Walker*, 613 F.2d 1349, 1355 (5ᵗʰ Cir.), *cert. denied*, 446 U.S. 944 (1980), a prosecutor may "state his contention as to the conclusions that the jury should draw from the evidence."  *United States v. Morris*, 568 F.2d 396, 401 (5ᵗʰ Cir. 1978).  Here, it is clear from the context in which many of the comments were made that the prosecutor was directing the jury to look at the evidence which he believed supported the State's case.  When the prosecutor made the comment in his opening statement that the case was "as close to guilty beyond all doubt" as the jurors would ever see, he had just finished putting forth a summary of the evidence that the State was going to introduce.  The prosecutor pointed out to the

jury that Petitioner's own admission to cell mate Michael Kendricks that he shot the victim was "pretty strong" evidence that Petitioner was the killer.  The prosecutor backed up his comment that he found "it a little bit absurd to consider the idea that she was already dead" with a recap of the medical examiner's testimony that he believe that the victim was still alive after the first shot to her head.   The prosecutor summarized the evidence supporting an affirmative finding of future dangerousness before making his comments that "the State knows" future dangerousness has been proven and "I think beyond all doubt" that he will be a continuing threat to society.  The prosecutor was also arguing the admitted evidence in support of the challenged statement regarding mitigation. The remaining comments containing the prosecutor's use of the phrase "I think," "I will guarantee," and "I'll bet" do not render his arguments improper.  Because the statements were not improper, an objection would not have been appropriate.  Counsel's failure to object to proper statements does not constitute deficient performance.

## 2.  Making personal requests

Petitioner next complains that the prosecutor was "allowed to make personal requests to the jury" to answer the special issues so that Petitioner would receive the death penalty.  Petitioner objects to the prosecutor stating "I ask you to go back into the jury room . . . ," "I want you as jurors to make sure that there is not a Willie Pondexter, this Willie Pondexter, in anybody's life again," and "I ask you to answer these questions yes . . . ."  Petitioner also argues that the prosecutor "invoke[d] the personal desires of the trial judge" when he stated "we are going to let Judge Biard sentence him to death."  Petitioner claims this comment implied to the jury that the trial judge wanted to sentence Petitioner to death.

The challenged language is found at the end of the prosecutor's punishment phase closing

19

argument where he was encouraging jurors to go back into the jury room and to think about the victim.  In light of Petitioner's conduct during the offense, the victim's suffering, and the lack of mitigating circumstances, the prosecutor urged the jury to find Petitioner a continuing threat to society and not excuse his actions.  The prosecutor asked the jurors to answer the future danger special issue "yes" and the mitigation issue "no," which would then require the trial judge to sentence Petitioner to death.  A court "should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." *Donnelly v. DeChristoforo*, 416 U.S. 637, 647 (1974).  Following this mandate, the Court finds that the prosecutor's comments did not violate Petitioner's constitutional rights, but rather, when read in context, were entirely proper.  Once again, the Court finds that counsel's failure to object did not amount to deficient performance.

### 3.  Misstating the evidence

Petitioner next argues that the prosecutor misstated the evidence.  In closing argument at the guilt/innocence phase, the prosecution stated that witness Deon Williams testified that Henderson handed the gun to Petitioner who then "fired a bullet right through [the victim's] brain."  On cross examination, however, Williams, who was present during the offense, stated that Henderson shot the victim in the head and that Petitioner shot the victim in the jaw.  The prosecutor also argued at punishment that Kendricks testified that Petitioner told him that he shot the victim in the head.  However, on direct examination by the prosecution, Kendricks testified that Petitioner told him that he shot the victim in the jaw.[5]

---

[5]  The testimony was as follows:
Kendricks: He shot her in the head - - in the jaw.
Prosecutor: In the jaw or the head?

The Texas Court of Criminal Appeals found that "the jaw is a portion of one's head, and that, to the extent the evidence shows that [Petitioner] shot the victim in the jaw, argument that he shot her in the head was completely proper."  The State court's decision on this point is reasonable.  The prosecutor's argument that Williams testified that Petitioner shot the victim through the brain is more troublesome.  Williams was the only witness to the crime that testified at the trial, and he unequivocally stated that Petitioner shot the victim in the jaw.  There was no evidence whatsoever that Petitioner shot the victim in the brain, and in fact, testimony from eyewitness Williams to the contrary.  Accordingly, the prosecutor's argument that Petitioner shot the victim in the brain is a misstatement of the evidence and counsels' failure to object amounted to deficient performance.  In a trial such as this one, where the cause of death was at the center of the case, the Court can fathom no reasonable strategy which would persuade defense counsel to refrain from objecting.  In reviewing the record, the Court found several other instances during closing argument, in addition to the misstatement pointed out by Petitioner, where the prosecutor argued that Petitioner shot the victim in the brain.

It is not enough to show a misstatement of the evidence to be entitled to *habeas* relief, however.  Petitioner must still demonstrate a reasonable probability that but for counsel's failure to object to the prosecutor's remarks, the result would have been different.  In other words, if counsel

---

Kendricks: In the jaw.

21

had objected, would the jury still have convicted Petitioner of capital murder?[6]  The State court's

decision that there was no prejudice is reasonable.  *See Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir.

2002) (en banc) (question for the court under these circumstances is "whether the [state] court's

ultimate conclusion- that there was no prejudice and, consequently, no ineffective assistance of

counsel under the *Strickland* test- is objectively unreasonable").  Assuming that counsel had objected

and the jury was instructed to disregard the prosecutor's comment, the jury could have reasonably

believed that the shot to the victim's jaw by Petitioner caused the victim's death, and accordingly,

find Petitioner guilty of capital murder.  The Texas Court of Criminal Appeals found that the

prosecution expert's testimony was persuasive evidence that the wound to the victim's jaw

contributed to her death.  The State court also found that, based on the greater weight of the evidence,

the victim was alive at the time both shots were fired and that each shot contributed to her death.  The

Court of Appeals concluded that Petitioner did not rebut the State court's finding that the wound to

the victim's jaw contributed to her death.  *See Pondexter*, 346 F.3d at 151.  This Court is bound by

the law of the case.  Petitioner has failed to demonstrate that there was a reasonable probability that

but for counsel's failure to object to the prosecutor's misstatement of the evidence, Petitioner would

not have been convicted of capital murder.

Petitioner also takes issue with the prosecutor's comments that "Over and over and over

[Petitioner] told Michael Kendricks that he shot Martha Lennox" and "Willie Pondexter said he killed

Martha Lennox."  Petitioner argues that there is no record Petitioner told Kendricks on more than one

occasion that he shot the victim, and that there is no record Petitioner said he "killed" anyone.

---

[6]  The Court notes that after the prosecutor's comments, defense counsel argued that if the jury believed
Deon Williams, they had to determine if the shot through the cheek and jaw actually caused the victim's death.  To
that extent, defense counsel's argument emphasized Williams' testimony that he saw Petitioner shoot the victim in
the jaw.

Kendricks testified that he and Petitioner talked about the offense "every other day," while they were housed together in jail for two and a half weeks.  It is reasonable to conclude that Petitioner did, in fact, tell Kendricks several times that he shot the victim.

The next comment, that Petitioner said he "killed" the victim, followed the comment about Petitioner telling Kendricks that he shot the victim.  The exact cause of the victim's death, whether the result of a gunshot to the brain or jaw and who fired the fatal gunshot, was hotly contested at trial.  As such, the prosecutor's misstatement crediting Petitioner with stating that he killed the victim, like the prosecutor's argument that Petitioner shot the victim in the brain, is troublesome and should have been objected to.  Nonetheless, the State court's finding that there was no prejudice is reasonable.  *See Neal*, 286 F.3d at 246.  The prosecution's expert testified that the shot to the jaw contributed to the victim's death, so even though there is no evidence that Petitioner stated that he killed the victim, the evidence supports the theory that Petitioner shot the victim in the jaw and that this conduct contributed to her death.

Petitioner next complains that the prosecutor misstated the evidence during his closing argument at the punishment phase.  The alleged misstatements are as follows:

You heard evidence from his girlfriend telling you about the other people he shot.

[Petitioner] likes to shoot people.

[Petitioner], how many things did we read off that he's done, 19 or 20 criminal offenses?

[Petitioner] killed her as she sat on that bed in total terror about what was happening to her.

[Petitioner] comes into that room and he corners her, he puts a gun up to her head and is starting to pull that trigger.

Petitioner claims that his girlfriend, Rhonda Briley, only testified about one person that Petitioner shot.  Review of her testimony, however, shows that she discussed two incidents involving

Petitioner shooting someone.   Briley also described an incident where she witnessed Petitioner holding a gun and chasing after an individual.   The prosecutor did not misstate the evidence about Briley's testimony.   Petitioner next complains about the prosecutor's comment that Petitioner "likes to shoot people."   While there is no evidence that Petitioner claimed to enjoy shooting people, it was certainly not a stretch for the prosecutor to make such a deduction from the trial testimony.[7]   In any event, even if counsel erred in failing to object, the comment did not prejudice Petitioner.   Petitioner also complains about the prosecutor stating that Petitioner had committed 19-20 criminal offenses in support of his argument that Petitioner posed a future danger.   An intake worker for the Department of Human Services in Oklahoma testified about four offenses Petitioner was convicted of as a juvenile, including assault and battery, trespassing, and disturbing the peace.   The assistant district attorney for McCurtain County, Oklahoma testified that Petitioner was on probation when he committed the instant offense and was facing a motion to revoke his probation based on an assault and battery committed against Marcus Bonner.   Linda Thomas testified about Petitioner brutally beating her.   Any misstatement concerning the specific number of offenses committed by Petitioner did not prejudice him in light of the aforementioned testimony and the instant crime.   Finally, Petitioner claims that the last two comments, characterizing his role in shooting the victim, are inaccurate.   Specifically, Petitioner complains that the evidence shows the victim was not sitting on her bed when he shot her, but was lying on her back unaware of what was happening.   He also argues that Williams, the only witness to the shooting to testify, never said that Petitioner cornered the victim and specifically testified that the gun was not right up against the victim's head when Petitioner shot her.   These comments, although not completely accurate, do not render the State court's finding of

---

[7] In addition to Briley's testimony about Petitioner shooting people, she testified that on several occasions Petitioner took her gun without her permission.

24

no prejudice unreasonable.

## 4.  Attacking the defense attorney

Petitioner next argues that the prosecutor attacked the defense attorney's representation of Petitioner.  Specifically, Petitioner claims that the prosecutor ridiculed defense counsel by making the comment that "it's hard to believe we are sitting in the same courtroom as [defense counsel]" in response to defense counsel's closing argument at guilt/innocence.  The prosecutor followed that comment up by stating "[Defense counsel] sees the evidence totally different than what [sic] the state sees it."  There is nothing improper about the prosecutor's comment; he was merely emphasizing the fact that the State's version of events differ from the defense version.  Petitioner also complains that the prosecutor implied defense counsel had evil motives when he suggested the defense believed Petitioner should not be convicted "because there might be some remote possibility that [the victim] was already dead when [Petitioner] fired that second shot."  Again, these comments were not improper; the prosecution was stating, albeit in a seemingly sarcastic manner, the defense theory of the case.  Defense counsel was not deficient in failing to lodge an objection to such comments.

## 5.  Misstatement of the law

Petitioner claims that the prosecutor was permitted to argue the law contrary to that presented in the court's charge, as well as to make incorrect statements of the law.  The prosecutor argued that future dangerousness had "to be proven beyond a reasonable doubt . . . .  That's clear and convincing evidence that would not cause you to hesitate."  The prosecutor also argued that "future dangerousness has been proven clearly, . . . ."  The trial court's charge instructed the jury that the prosecution must prove future dangerousness beyond all reasonable doubt, "reasonable doubt" being "the kind of doubt that would make a reasonable person hesitate to act in the most important of his

own affairs."   While using the phrase "clear and convincing" to describe reasonable doubt is inaccurate, Petitioner was not prejudiced by the prosecutor's argument.   The jury charge, which was read to the jury prior to closing arguments as well as taken into the deliberation room, contained a proper instruction on reasonable doubt.   Petitioner also claims that the prosecution confused the jury by arguing that mitigating evidence was the equivalent to an "excuse" for Petitioner's conduct. Mitigating evidence was defined in the court's charge as "evidence that a juror might regard as reducing the defendant's moral blameworthiness."   In a concurring opinion in *California v. Brown*, 479 U.S. 538, 545 (1987), Justice O'Connor deemed mitigating evidence about a defendant's background and character an "excuse."   The prosecutor's argument was not improper and, therefore, defense counsel was not deficient in failing to object.

## 6.  Mischaracterization of evidence

Petitioner next argues that the prosecution mischaracterized the "inculpating and aggravating evidence" by suggesting that the jury consider it in the context of mitigation.   Specifically, Petitioner complains that the prosecutor argued that Petitioner's mental illness justified sentencing him to death when the prosecutor stated "[t]here is something wrong with [Petitioner] and he needs to be taken out of our society."   The Fifth Circuit has recognized that the "double-edged" nature of certain mitigating evidence regarding a defendant's background and character could be used by the prosecution to argue in favor of future dangerousness.   *See Ladd v. Cockrell*, 311 F.3d 349, 360 (5th Cir. 2002 ) (mitigating evidence might suggest defendant is likely to continue to be dangerous in the future); *Johnson v. Cockrell*, 306 F.3d. 249, 253 (5th Cir. 2002), *cert. denied*, 538 U.S. 926 (2003) (mitigating evidence could be read by the jury to support, rather than detract, from defendant's future dangerousness). There was nothing improper about the prosecutor's comment.

26

Petitioner also contends that the prosecutor was allowed to make comments, without objection, that permitted the jury to consider Petitioner's threat to free society as opposed to prison society.  In Texas, when considering whether a defendant poses a continuing threat to society, a jury considers both free society and prison society.  *See Morris v. Texas*, 940 S.W.2d 610, 613 (Tex.Crim.App. 1996).  Again, the prosecutor's argument was proper.  Defense counsel was not deficient in failing to object to these comments.

### 7.  Shifting the burden of proof

Petitioner claims that the prosecutor was allowed to shift the burden of proof to the defendant when the prosecutor argued "I find it a little bit absurd to consider the idea that she was already dead. '*Let's walk this guy because there might be some remote possibility* that she was already dead when [Petitioner] fired that second shot.'" (emphasis in petition)  Because Petitioner does not explain how the prosecutor's comment shifted the burden, the Court is left to presume that Petitioner objects to the prosecutor's inference that Petitioner failed to prove the "remote possibility" that the victim was already dead when he shot her.  Contrary to Petitioner's claim, the prosecutor was not shifting the burden of proof to Petitioner.  As the Court stated when it addressed this comment earlier, the prosecutor was commenting on the defense theory of the case.

Petitioner also claims that the prosecutor commented on Petitioner's failure to testify or contradict evidence when he argued "So do you have any reasonable hesitation that it happened over there in Red River County?  Absolutely not.  There is nothing that shows that."  The prosecutor was going through the items in the charge which had to be proved beyond a reasonable doubt, one of them being the location of the crime in Red River County.  The fact that the prosecutor was pointing out that there was no evidence contradicting this portion of the charge does not amount to a comment on

Petitioner's failure to testify.  Accordingly, no objection was necessary.

Petitioner argues that taken collectively, the alleged errors deprived him of effective assistance of counsel.  The Fifth Circuit has held that the cumulative error doctrine provides relief only where "(1) the individual errors involved matters of constitutional dimensions rather than mere violations of state law; (2) the errors were not procedurally defaulted for habeas purposes; and (3) the errors 'so infected the entire trial that the resulting conviction violates due process.'"  *Derden v. McNeel*, 978 F.2d 1453, 1454 (5th Cir. 1992), *cert. denied*, 508 U.S. 960 (1993).  Meritless claims or claims that are not prejudicial cannot be cumulated, regardless of the total number raised.  *Westley v. Johnson*, 83 F.3d 714, 726 (5th Cir. 1996), *cert. denied*, 519 U.S. 1094 (1997) (citing *Derden*, 978 F.2d at 1461).  Applying this standard, the Court cannot conclude that the cumulative effect of any errors that occurred deprived Petitioner of a fair trial.

The Court finds that the State court's denial of Petitioner's fifteenth and sixteenth claims was not contrary to, or an unreasonable application of, clearly established federal law.  *See* 28 U.S.C. § 2254(d)(1).

In his seventeenth claim, Petitioner alleges numerous instances of ineffective assistance of counsel effecting his trial, as well as several instances of trial errors effecting his appeal.  The Texas Court of Criminal Appeals found that Petitioner failed to prove either prong of the *Strickland* standard.  This Court must determine if the State court's decision was contrary to, or an unreasonable application of, clearly established federal law.  *See* 28 U.S.C. § 2254(d)(1).  Some of Petitioner's allegations have been raised previously, and therefore, have already been addressed by the Court.  Of the allegations not previously addressed, Petitioner first complains that his attorneys did not visit him or discuss the case with him until the month just prior to jury selection "in violation of the duty to

visit him to prepare for trial."  Petitioner has not cited any case law in support of his claim.  Assuming counsels' performance was deficient, Petitioner has failed to explain how an earlier visit by counsel would have made a difference in the outcome of the case.  "Mere general assertion that prejudice resulted from lack of preparation is insufficient to reverse a conviction for ineffective assistance of counsel."  *United States v. Oakley*, 827 F.2d 1023, 1026 (5th Cir. 1987).  Petitioner has not shown prejudice.

Next, Petitioner asserts that his counsel did not inform him of all the witnesses and evidence that they had been provided by the prosecution, and in particular, that he was not aware that Linda Thomas was going to testify that Petitioner assaulted her.  If he had known about this testimony, Petitioner claims he would have proved through Rhonda Briley that he was not even in the same town as Thomas when she was assaulted.  In their affidavits offered at the State writ hearing, trial counsel stated "based upon my communications with my client, I knew that he had stolen something from [Thomas] at one time but no violence was involved at all."  This demonstrates that Petitioner had notice that Thomas might be involved in the trial, and nonetheless, chose to limit what he wanted to tell his attorneys about the offense.  "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions.  Counsel's actions are usually based . . . on information supplied by the defendant."  *Strickland*, 466 U.S. at 691; *see also King v. Lynaugh*, 868 F.2d 1400, 1405 (5th Cir.), *cert. denied*, 489 U.S. 1099 (1989).  Furthermore, the State's response to Petitioner's pre-trial request for disclosure of the existence of extraneous offenses revealed an offense of first degree robbery and assault and battery with a deadly weapon against Thomas.  It is highly unlikely that Petitioner was unaware of these offenses.

As for Petitioner's complaint that his counsel did not question Briley about Petitioner's

whereabouts on the night Thomas was assaulted, it is well settled that "complaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy," and counsel is entitled to a presumption that his performance was adequate.  *See Wilkerson v. Cain*, 233 F.3d 886, 892-93 (5th Cir. 2000).  The Court cannot second guess counsels' decision not to recall Briley to offer an alibi, particularly since Petitioner has not offered any evidence, in the form of an affidavit or otherwise, demonstrating how Briley would testify.

Petitioner next contends that counsel failed to obtain a written order granting pretrial discovery which prevented counsel from keeping "surprise information out of evidence."  Although Petitioner does not identify the surprise information, he does reference the record where defense counsel objected to the admission of charges contained within probation reports which were purportedly not provided to the defense.  Assuming counsels' performance was deficient, Petitioner has failed to demonstrate how admission of the charges against him affected the outcome of his case. Petitioner also complains that counsel did not object to the prosecutor's comments during *voir dire* that the jurors could return a guilty verdict even if they did not unanimously agree on whether Petitioner committed murder in the course of burglary or robbery.  The prosecutor explained that the jury could return a general verdict, which means that so long as jurors agreed that Petitioner committed one of the underlying felonies to the capital murder in the indictment, either burglary or robbery, they did not have to agree on which felony was committed.  Because the prosecutor's comment was a correct statement of Texas law, an objection by defense counsel would have been improper.

Next, Petitioner complains that defense counsel did not strike juror Candice Trice.  Petitioner claims that Trice should have been struck because she remembered hearing about the offense and

Henderson's conviction, had an opinion that a capital murder had occurred, had recently read a book about a gruesome murder in which the killer was given the death penalty, believed the justice system was too lenient on criminals, and expressed some uncertainty about her ability to follow the trial court's instructions regarding parole.  However, none of the reasons urged by Petitioner demonstrate that Trice should have been struck, and the Court's own review of the record shows that Petitioner's complaint is unfounded.  Trice explained "you can sit there and say I'm for the death penalty, but when you get down to being a juror, it's really hard to say yes, give him the death penalty."  She stated that despite the fact that Henderson was convicted of capital murder, she could be impartial and judge the evidence in the instance case against Petitioner.  Trice also appeared to have a good grasp of the concept of mitigation, and would be willing to consider all types of evidence as mitigating.  Importantly, she distinguished between agreeing with the law and following the law, and understood her duty to follow the law if she was chosen as a juror.  In light of the record, the Court will not second guess defense counsels' decision to forego striking Trice.

Petitioner next complains that defense counsel failed to object to an improper jury instruction which he claims "instructed the jury to answer the first special issue affirmatively if the jurors believed that Petitioner's mitigating evidence militated in favor of a life sentence."  Petitioner's contention is without merit.  The charge did not reference the first special issue, but rather instructed the jury that if it determined "when giving effect to the mitigating evidence, if any, that a life sentence, as reflected by an affirmative finding to the *issue under consideration*, rather than a death sentence, is an appropriate response to the personal culpability of the defendant, an affirmative finding should be given to that *special issue under consideration*." (emphasis added) Because the instruction was not improper, there was no reason for defense counsel to object.

31

Petitioner also complains that defense counsel failed to request a limiting instruction on hearsay in the Court's final written charge at punishment.  The trial court overruled defense counsel's hearsay objection to a witness's testimony about an encounter with Petitioner, finding that the testimony was an exception to the hearsay rule.  The trial court instructed the jury that the court was not commenting on the truthfulness of the witness's testimony, but rather that the testimony "goes to [the witness's] state of mind as to why he was there."  Assuming defense counsel should have requested a limiting instruction, Petitioner does not explain how he was prejudiced by the lack of such an instruction.

Next, Petitioner argues that defense counsel elicited prejudicial evidence when he bolstered the credibility of the State's pathologist, Dr. Guileyardo, by telling the jury in his opening statement that "[t]he medical examiner will probably be qualified as an expert.  He's a medical doctor, has been for a long time, . . . ."  Defense counsel was preparing the jury for some of the witnesses and their testimony.  There is nothing improper about defense counsel's conduct and the witness's status would have come in through the prosecution even over any objection by defense counsel.  In any event, Petitioner has failed to show how he was prejudiced by defense counsel's comments.

Petitioner also complains that defense counsel bolstered the credibility of the State's witnesses when he thanked police officers for testifying in the case and elicited testimony from Michael Kendricks which impressed upon the jury the dangers of testifying against a defendant while serving time in prison.  Thanking witnesses for testifying, particularly individuals that generally have the public's trust as well as serve the public, does not amount to deficient performance.  As for Kendricks' testimony, defense counsel was trying to show that Kendricks was motivated to testify because he was trying to curry favor with authorities.  Counsel elicited the fact that "snitches"

32

sometimes get assaulted or even killed in prison, and then asked Kendricks "You are telling this jury that you came up here and testified and you don't have any deal made with the state?"  Defense counsel was attempting to cast doubt on Kendricks' testimony, and his choice in selecting this method to do so falls within the wide range of acceptable and sufficient representation and was objectively reasonable.

Next, Petitioner argues that defense counsel bolstered the State's case by introducing the fact that Henderson had been convicted of capital murder and sentenced to death, as well as repeatedly stating that the prosecution introduced "a lot of evidence" in support of a guilty verdict and death sentence.  The portion of the record Petitioner cites in support of the first part of his claim is defense counsel's cross-examination of Deon Williams.  Defense counsel brought out the fact that Williams' plea deal with the State required him to testify against all of the co-defendants involved in the murder, including Henderson.  Further, defense counsel's questions revealed that Williams testified in Henderson's trial that Henderson shot the victim in the head, while Petitioner shot the victim in the jaw.  Defense counsel made the strategic decision to elicit information about Henderson's trial and sentence, presumably to show both Williams' motivation to testify and that Williams consistently testified that Henderson shot the victim in the head while Petitioner shot her in the jaw.  Given the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *Strickland*, 466 U.S. at 689, the Court cannot conclude that the choice to present Henderson's conviction and death sentence was deficient.[8]

Petitioner's claim that defense counsel improperly bolstered the State's case when he noted

---

[8] Petitioner's record cites do not contain testimony regarding Henderson's capital murder conviction or death sentence.  However, defense counsel, at the very least, opened the door to this information when he brought up Henderson's trial during Williams' cross-examination.

33

that the prosecution had "a lot of evidence," is likewise without merit.  Defense counsel was arguing that despite all of the evidence the State had introduced, there was not one "piece of evidence there that connects [Petitioner] with actually causing" the victim's death.  Defense counsel also commented that the prosecution put on "a whole bunch of . . . arrest reports, charges, affidavits . . ." but no "evidence that those things resulted in convictions."  Rather than bolstering the State's case, defense counsel was showing that all of the evidence fell short of proving Petitioner committed capital murder or was likely to be a future danger.

Petitioner next complains that defense counsel stipulated to Petitioner's identity, the date and location of the offense, and the fact that Petitioner was in the victim's house.  Because there is no evidence that any of those matters were in dispute, the Court presumes defense counsel's conduct was reasonable.  Petitioner also argues that defense counsel inflamed the jury when he stated "Of course, you know what it takes to get a conviction: it takes proof beyond a reasonable doubt" because Petitioner contends this comment emphasized how difficult it is to obtain convictions based on that high standard of proof.  However, read in context, the point of defense counsel's comment was to show that the State had failed to show Petitioner posed a future danger by virtue of prior convictions.  Finally, Petitioner complains that defense counsel never asked the jury to be lenient or have mercy on Petitioner.  The Court is not persuaded that defense counsel's conduct in this regard was unreasonable.

Petitioner next sets forth a litany of errors he argues adversely affected his appeal.  First, Petitioner claims that defense counsel failed to preserve error on the issue of the State's use of peremptory challenges in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986).  Specifically, Petitioner contends that defense counsel did not cross-examine the prosecutor about his race-neutral

explanations or notes that he might have taken during *voir dire*.  The Texas Court of Criminal Appeals addressed Petitioner's *Batson* challenge on direct appeal, noting that the prosecutor was not cross-examined and finding that because there was no evidence in the record establishing that the prosecutor used his notes to refresh his memory during his testimony, the trial court did not err in failing to require the prosecution to deliver its notes taken during jury selection.  *Pondexter v. Texas*, 942 S.W.2d 577, 582 (Tex.Crim.App. 1997).  Nonetheless, the State appellate court reached the merits of Petitioner's claim and determined that Petitioner failed to establish that the prosecution's race neutral reasons for striking the jurors in question were a pretext.  *Id.*  Assuming counsel's conduct in failing to preserve error was deficient, Petitioner has made no showing of prejudice.

Next, Petitioner argues that his trial and appellate counsel failed to investigate possible jury misconduct.  Petitioner contends that several jurors stated that it made no difference to them if the victim was dead or alive when Petitioner shot her, which shows they disregarded the instruction that Petitioner must have intentionally caused the victim's death.  The Court disagrees with Petitioner's interpretation of the juror's comments.  None of the jurors stated that they believed the victim was already dead when Petitioner shot her, only that it might not have made a difference if there was testimony from a pathologist that she was dead when Petitioner shot her.  The Court does not believe a juror's comment that he was "afraid for [Petitioner] to be out on the street" indicated that the juror disregarded the trial court's instruction not to consider the possibility of parole.  By the same token, a juror's statement that he wanted Petitioner to testify and "show contrition" did not mean he disregarded the trial court's instruction not to consider Petitioner's failure to testify.  There was no mention that parole law or Petitioner's right to remain silent was ever discussed during deliberations.  Petitioner has shown no prejudice from any failure to investigate possible jury misconduct.

Petitioner next claims that defense counsel failed to make a proper objection every time extraneous offense evidence was offered, which prevented error from being preserved for appeal. Upon review of the record, the Court finds that defense counsel did, in fact, object to the evidence and specifically asked for a running objection.  Petitioner also takes issue with defense counsel's failure to "specifically object to the prejudicial and inflammatory nature of the demonstration before the jury of the crip gang handshake."  On direct appeal, the Texas Court of Criminal Appeals found that the trial court erred in admitting evidence of Petitioner's gang affiliations and activities, including the handshake, but concluded the error was harmless because the evidence made no contribution to the guilty verdict or punishment.  *Id*.  The State court's finding of no prejudice was reasonable.

Finally, Petitioner argues that defense counsel failed to preserve the issue of the need for an expert pathologist, as well as failed to complain about the sufficiency of the evidence on direct appeal. Contrary to Petitioner's assertion, trial counsel's failure to call an expert pathologist has been addressed extensively by both the state and federal courts.  Petitioner also complains that "even though the entire conviction was based upon tenuous theories of the State's pathologist and questionable testimony from other felons," defense counsel did not raise a sufficiency of the evidence ground on direct appeal.  The State *habeas* court noted that Petitioner waived any such sufficiency claim, but found, after a hearing with testimony on the cause of death from the State and defense expert pathologists, that Petitioner "has failed to demonstrate that his conduct in shooting the victim through the head with a handgun was clearly insufficient to cause the death of the victim."

This Court finds that the State court's decision on Petitioner's seventeenth claim was not contrary to, or an unreasonable application of, clearly established federal law.  *See* 28 U.S.C. § 2254(d)(1).  The Court will grant the Director's motion for summary judgment on Petitioner's

seventeenth claim.

In his eighteenth claim, Petitioner argues that his appellate counsel failed to provide effective assistance, incorporating the complaints raised in his seventeenth claim and adding a few more alleged errors.  Specifically, Petitioner contends that "counsel made numerous objections to inadmissible hearsay at the trial which were overruled, but he failed to present any of these errors. . . on appeal."  Petitioner does not develop this argument, and only cites to portions of the record where the various objections were made.  Petitioner has failed to demonstrate how counsels' performance was deficient and how this deficient performance prejudiced his appeal.  Accordingly, the Court will grant the Director's motion for summary judgment on Petitioner's eighteenth claim.

In his nineteenth claim, Petitioner argues that he was denied Due Process because the judge presiding at his capital murder trial was not authorized to preside over his trial in Bowie County, Texas.  The State *habeas* court addressed this issue and concluded that the trial judge had authority to act in Petitioner's trial.  Petitioner fails to cite any constitutional provision, state law, or case law in support of his claim.  Furthermore, Petitioner fails to demonstrate how he was denied a fair trial. Because Petitioner has not shown that the State court's conclusion that the trial judge had authority to act was contrary to or an unreasonable application of federal law, the Court will grant the Director's motion for summary judgment on Petitioner's nineteenth claim.  *See* 28 U.S.C. § 2254(d)(1).

In his final claim, Petitioner argues that the Texas law governing post conviction writs violates his Due Process rights.  It is well established, however, that "infirmities in state *habeas* proceedings do not constitute grounds for federal *habeas* relief."  *Duff-Smith v. Collins*, 973 F.2d 1175, 1182 (5th Cir. 1992), *cert. denied*, 507 U.S. 1056 (1993).  Because "an attack on the state *habeas* proceeding

37

is an attack on a proceeding collateral to the detention and not the detention itself," Petitioner's claim must fail. *See Rudd v. Johnson*, 256 F.3d 317, 320 (5th Cir.), *cert. denied*, 534 U.S. 1001 (2001).  The Court will grant the Director's motion for summary judgment on Petitioner's twentieth claim.

The Court has considered Petitioner's arguments raised in his Supplemental Brief (doc. #64) following the remand from the Fifth Circuit.  Petitioner contends that the Supreme Court's opinion in *Wiggins v. Smith*, 539 U.S. 510 (2003) requires this Court to revisit his ineffective assistance claim and review *de novo* issues which were presented to the state court but that were not adjudicated by the state court.  In *Wiggins*, the Supreme Court considered whether the petitioner had suffered prejudice from counsel's ineffective assistance.  The Court held that its review of that issue "[was] not circumscribed by a state court conclusion with respect to prejudice" because the lower courts had not reached that prong of the *Strickland* analysis.  *Wiggins*, 539 U.S. at 534.  Petitioner's arguments are compelling, but this Court cannot address his contentions.  The Supreme Court had decided *Wiggins* before the Court of Appeals rendered its decision in this case.  In light of the timing of the Supreme Court's decision, the Court is persuaded that it should not review Petitioner's claim under the *de novo* standard of review.  The Court has accordingly considered, but must ultimately reject, the arguments made in Petitioner's Supplemental Brief.  In view of this holding, Petitioner's Motion for Entrance of a Scheduling Order (doc. #63) is denied as moot.

The Court finds that there are no material issues of fact and that the Director is entitled to judgment as a matter of law on each of the claims raised in Petitioner's petition.  The Director's Motion for Summary Judgment will be GRANTED.  Petitioner's application for a writ of *habeas corpus* will be DENIED.  An order and judgment will be entered.

SIGNED this 27th day of September, 2006.

_____
T. JOHN WARD
UNITED STATES DISTRICT JUDGE